*POSTED ON WEBSITE*
*NOT FOR PUBLICATION*

**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re<br><br>P&M SAMRA LAND INVESTMENTS, LLC,<br><br>　　　　　Debtor. | Case No. 15-29136-C-12<br>Docket Control No. PRC-1 |

**This Memorandum Decision is not appropriate for publication.**
**It may be cited for persuasive value on the matters addressed.**

**SUPPLEMENTAL MEMORANDUM OPINION AND DECISION**

At the January 30, 2019, second continued hearing on the Motion to Dismiss this Chapter 12 Case the court stated the Ruling on the record, with findings of fact and conclusions of law stated orally. Given the complexity of the discussion and arguments of the respective counsel, the court provides this Supplemental Memorandum to the Ruling. This is in addition to and as part of (not in place of) the Findings, Conclusions, and Ruling stated orally on the record at the hearing.

As discussed at the hearing, the dismissal of this case is not on shortened time or without an opportunity to allow the Debtor, who is also serving as the Plan Administrator, to address the defaults in the Plan and the proper prosecution of this case.[1]

Though denied confirmation of the proposed modified plan on December 11, 2018, Debtor took no action in this case with the court until 9:59:59 p.m. on January 28, 2019, when a pleading entitled "Motion to Sell Debtor's Principal Real Estate Asset" was filed. Dckt. 688. This was one

---

[1] Prior to confirmation the Debtor served in the position of the "debtor in possession," rather than a trustee being appointed, and then after confirmation, served as the plan administrator - both having fiduciary duties (as the debtor in possession to the bankruptcy estate, and as the plan administrator to perform the plan as confirmed by the court). In this Supplemental Memorandum Opinion and Decision the court uses the shorthand reference to P&M Samra Land Investments, LLC as the "Debtor," without identifying it as being the debtor in possession or plan administrator to be consistent with the use of that terminology by the prior judge to whom this case was assigned.

business day before the January 30, 2019 second continued hearing on the Motion to Dismiss. The confirmation of the proposed Modified Plan was denied on December 10, 2018, for several reasons, which the judge stated as:

> The motion will be denied. The debtor has not established feasibility of the proposed plan.
>
> **The debtor has not established that it can sell the property for $2.7 million.** The declaration from its real estate agent is to the effect that he believes the property can sell for "at least $2,700,000." Docket 646. **This is not admissible**. There is no basis in the declaration for the agent's qualifications to render an opinion about the value of the property. Docket 646; Fed. R. Evid. 701 & 702.
>
> Moreover, the assertion that there is a $2,497,500 offer for the property **is inadmissible hearsay.** Docket 677; Fed. R. Evid. 801(c) & 802. There is **no declaration from the debtor explaining or even mentioning the offer**. See Dockets 645, 646, 675. There also is no evidence that the offer is an arms-length one.
>
> Next, the debtor has not established that a sale for $2.7 million would pay all secured claims in full. As mentioned earlier, there are no unsecured claims in the case.
> . . .
> As the claims potentially exceed $2,608,783.17, with sales costs of approximately 8% ($216,000 on a sale of $2.7 million), **there will insufficient funds to pay all creditors in full from a $2.7 million sale**. Accordingly, the motion will be denied.

Civil Minutes, Dckt. 682 (emphasis added).

The hearing on the Motion to Dismiss was first continued from the original November 13, 2018 hearing date to December 10, 2018, to be heard in conjunction with the Motion to Confirm the proposed Amended Second Modified Plan. This continuance was based on the representations of the Debtor that it would sell the property.

> As to the request for dismissal, the movants contend that the debtor has defaulted under the terms of its plan. The debtor paid the plan payment due May 25, 2018 on August 1, 2018 and the debtor has not made the monthly payments due June 25, 2018 and thereafter.
>
> The **debtor does not dispute this default** but **contends that it seeks to sell the real property** securing the claims of the movants and Ag. The debtor filed on November 4, 2018 a second modified plan along with a motion to confirm the modified plan. Dockets 635 & 639. **The second modified plan provides for the sale of the debtors real property. The hearing on the motion is set for December 10, 2018 at 10:00 a.m.**
>
> The debtor will be given the opportunity to obtain confirmation of this second modified plan. As such, the court will continue the hearing on the dismissal motion to December 10.

Civil Minutes, Dckt. 654 (emphasis added).

Though confirmation of the Amended Second Modified Plan was denied and the bankruptcy case hung by a thread, there appears to have been little, if any, action taken to try and sell the property. The Motion to Sell filed at 9:59 p.m. on January 28, 2019, does not request that the court approve a sale of the property to any buyer. Rather, it states that the Debtor "seeks authority to sell," there is a "current offer" for $2.4 Million, a copy of which is filed with the Motion as Exhibit A. Debtor "expects" to receive a higher offer the week of February 4, 2019. Motion ¶ 3, Dckt. 688.

The Motion continues, with the Debtor stating that it realizes the current offer of $2.4 Million is not sufficient to pay the secured claims, but that Debtor hopes to work something out in the future.

At the hearing, counsel for Debtor in Possession admitted that there was no contract for the sale of the property. Rather, that a contract would be "forthcoming." The Motion misstates the status of such offers, exaggerating in stating "The Debtor believes that this **pending sale** of the Property . . . ." *Id.*, Dckt. p. 4:1 (emphasis added). There was no pending sale to be approved, there was no signed contract, and there was no buyer committed to purchase the property.

Counsel for Debtor in Possession's argument that they just didn't focus on a contract for sale, as if a contract is a mere surplusage that is irrelevant for a motion for authorization to sell property, was not persuasive.

The Motion concludes, pleading that if the case is dismissed then the senior lien creditor would proceed with a foreclosure sale, thereby harming the creditors holding junior secured claims. The Debtor in the Motion and at the hearing pleaded with the court that it was working to protect the junior lien creditors. However, it was obvious at the hearing that no creditors stood with the Debtor - either on the merits or physically. No creditors spoke in support of Debtor. Physically, on one side of the courtroom stood Debtor's counsel, alone, and on the other the Chapter 12 Trustee and creditors' attorneys.

The Exhibit A which is filed with the Motion consists of the following documents:

A. Buyer Counter Offer No. 1

    1. This is a Counter Offer to Debtor's Counter Offer 1.

    2. Sales Price of $2,331,000.00.

|   |   |   |
|---|---|---|
| | 3. | Seller to "clean garbage, debris from property and have deskside prior to close of escrow." |
| | 4. | Buyer Counter Offer 1 is **dated December 4, 2018.** |
| | 5. | Buyer Counter Offer 1 expired on 5 p.m. on the third day after December 4, 2018. |
| | 6. | Buyer Counter Offer 1 was not accepted (no signature of acceptance) by Debtor. |

Exhibit 1 at p. 1, Dckt. 691.

    B.    Debtor Counter Offer 1

            1.    Sales Price to be $2,497,500.00.

            2.    Sold AS-IS.

            3.    The Real Estate Agent is representing both the buyer and the Debtor (fiduciary) seller.

            4.    The Counter Offer 1 is **dated December 1, 2018.**

*Id.* at pp. 2-7.

    C.    Offer From Buyer

            1.    Offer is **dated November 21, 2018.**

            2.    Sale price is $2,184,500.00.

            3.    Subject to financing of $1,515,150.00.

*Id.*, pp. 8-16.

**Unauthorized Borrowing**

At the January 30, 2019 hearing on the Motion to Dismiss, Counsel for the Debtor argued that the Motion should be denied, or at least continued, because the Debtor was now current on Plan payments. Counsel explained that Debtor was not current due to having generated monies from the farming operation, but that Debtor had borrowed the money. Thus, the amount of the debt in this case did not decrease, but increased.

The Plan does not provide for such borrowing. The Debtor did not seek court authorization to engage in such borrowing of money or approval of the terms of the purported loan. It was then disclosed that the loan was obtained by another client of Counsel for Debtor and it was the client of

4

Counsel who then loaned the money to Debtor. The explanation for borrowing money without any authorization from the court or the plan was given as, "the Debtor needed to do it." As stated by the court at the hearing, the Debtor (and its principals) makes it clear that it (and they) will do whatever is deem "necessary," without regard to the law. It is noteworthy that this was all done while represented by, and with the assistance of, Debtor's counsel.

**Terms of Confirmed Chapter 12 Plan**

After the hearing the court reviewed Debtor's confirmed Chapter 12 Plan – the Fourth Amended Chapter 12 Plan, with the confirmation order filed on March 29, 2017. Dckt. 502. The Fourth Amended Plan provides that it will be funded from the farming operations – not a liquidation of assets or borrowing. Plan, pp. 2:2.5-12.5; Dckt. 502 at 6. Further in the Plan; ¶ 44.01, Means of Implementing Plan; it states that the Plan will be implemented through farming operations and the monies therefrom. *Id.* at 13.

**Cause Exists to Dismiss the Case**

As provided in 11 U.S.C. § 1208, the court may dismiss a Chapter 12 case for cause, which includes (but is not limited to) the following grounds:

> (1) unreasonable delay, or gross mismanagement, by the debtor that is prejudicial to creditors;
>
> (6) material default by the debtor with respect to a term of a confirmed plan;
>
> (9) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation

11 U.S.C. § 1208(c)(1), (6), (9).

Debtor has defaulted in the required plan payments. As stated by Counsel for the Debtor at the January 30, 2018 hearing, Debtor missed the last farming season because it was unable to obtain crop financing. As stated by the Chapter 12 Trustee, Debtor was almost four plan payments in default as of October 29, 2018. Chapter 12 Trustee Response, Dckt. 620.

As asserted by Creditors at the second continued hearing on January 30, 2019, the Debtor's failure to make payments was prejudicial to their interests.

Debtor does not demonstrate an intention to diligently prosecute this case, but demonstrates a rear-guard action of filing things at the last minute, promising future action, and working to obtain

1　delay. While Debtor's counsel professes a desire of Debtor to "protect" the creditors holding junior
2　secured claims, none of these creditors stepped up supporting such "protection." Rather, the delay
3　sought by Debtor would work to harm them. To the extent that there is $2.4 or $2.5 Million dollars
4　of value (which is less than the total secured claims and leaves the Debtor "out of the money"), with
5　the case dismissed the creditors can seek to protect their interests - whether by paying the senior
6　creditor, seeking a receiver to market and sell the property, or other creditor action.

7　　Debtor's contentions with respect to the Motion For Authorization to Sell filed at 9:59 p.m.
8　on January 28, 2019, and how it demonstrates Debtor's good faith and diligence in prosecuting this
9　case are not credible. The Motion misrepresents that there is a sale to approve - there is none. The
10　Exhibit of Offer and Counter Offer documents are almost two months stale. Counsel's statement
11　that he really didn't think he needed to focus on and have a contract for the sale of property to go
12　with his Motion rings hollow. Rather, the conduct of Debtor sounds in the nature of an owner of
13　property that is so over encumbered that there is no value for the owner, so every dodge and tactic
14　to delay and try to beat down the creditors to give the Debtor something is more plausible. Rather
15　than having the junior secured creditors' interests at heart, Debtor worked with Counsel to put their
16　interests further at peril.

17　　Cause exists to dismiss this case.

## ADDITIONAL REVIEW OF THE FILE IN THIS CASE

19　　Having reached the above conclusion, the court also looked back in the file (from when the
20　case was pending before another judge) to see if there were other events which would change any
21　of the conclusions above. To the contrary, the prior conduct of Debtor reenforces the above
22　conclusions.

23　　This case was filed on November 24, 2015. In reviewing the prosecution of the case, it
24　appears that the Debtor in Possession, and its responsible representatives, have faced some
25　"challenges." In the July 25, 2016 Civil Minutes denying confirmation of the Corrected Second
26　Amended Plan, confirmation of the Plan was denied due to Debtor in Possession not proposing a
27　Plan in good faith, with the court concluding:

28　　Plan confirmation will be denied for the following reasons:

(1) **The plan is not proposed in good faith** because, among other things, **the debtor is treating secured claimants unfairly**. While the plan is proposing not to impair the fourth priority mortgage claim of the **Thiel Family Trust, given that creditor's insider-like relationship with the debtor, the plan proposes to impair each of the first three in priority claims secured by the property**. The plan proposes to reamortize the loans of the first three in priority secured creditors and pay them interest only until a balloon payment due on February 1, 2022. Docket 170 at 12-13.

In other words, while the fourth priority mortgage claim is receiving principal and interest payments, the senior three claims will receive no principal during the duration of the plan.

In addition, **the plan does not reveal the terms of the Thiel loan. The court cannot determine the monthly payments owed to Thiel under the plan**.

(2) The plan does not satisfy the best interest of creditors test. While the debtor agrees that unsecured creditors would be paid in full in a chapter 7 liquidation, the plan does not pay them in full. The plan proposes to pay $61,124.68 a year for five years to unsecured creditors, totaling $305,623.40, whereas the filed unsecured claims exceed that amount now (approximately $384,864). Ag-Seeds has amended its claim, increasing it by about $76,000. POC 6-2. The plan then violates the best interest of creditors test of 11 U.S.C. § 1225(a)(4).

Even if the debtor will be objecting to some claims, the plan must still be feasible and provide for such claims in the event the debtor is unsuccessful at prevailing on such objections.

(3) The **plan does not state the monthly/annual payment amounts** to the creditors and the due date for such payments. This must be addressed as to all creditors.

(4) The plan does not state the aggregate amount of the general unsecured claims and their dividend. This should be stated under the heading providing treatment for such claims.

(5) The debtor has not established feasibility. Even if the court were to allow the disparate treatment of the secured claims, **the court cannot tell from the record the monthly payments due on the Thiel claim and thus whether the debtor has sufficient income to pay the claim**.

(6) The plan is not feasible because the debtor expects to fund it in part with a $60,000 per year plan contribution from Stone Lake Farm Enterprises, Inc., proposed to be increased to $75,131.48 (Docket 208 at 2), an entity for which the court has evidence it sustained a loss of $13,511 in 2015. In 2014, Stone Lake had a net profit of only $76,079. Docket 171, Ex. D.

The debtor's response that Stone Lake will have the promised $75,131.48 for the debtor because it has or will be planting more acreage (conflicting statements of 350 acres and 500 acres) of organic corn is unpersuasive.

The court is not satisfied with the explanation that Stone Lake's losses last year were due solely to planting 99 acres of organic corn, as opposed to planting 350 or 500 acres. Stone Lake's expenses for planting the 99 acres were correspondingly a lot less as well. For example, for 2014, Stone Lake's expenses were $453,184, whereas for 2015 they were $173,411. Docket 171, Ex. D.

If planting only 99 acres last year was indeed the sole cause of Stone Lake's loss, Mr. Samra should have known not to do this and plant more acreage of corn. The **debtor's principal, Mr. Samra, who is also Stone Lake's sole owner and principal**, boasts of having over 50 years of farming experience, with eight of those years having farmed organic corn. Docket 208 at 2.

Further, Stone Lake's 2015 loss begs the question of who absorbed the loss. Obviously the debtor did not help Stone Lake, as the debtor was unable to pay its own creditors. The debtor defaulted on Ms. Saini's second mortgage claim in or about August 2015. Neither the debtor, nor Stone Lake has answered this question.

Furthermore, the court has no evidence of Stone Lake's current assets and liabilities. The latest financial statement for Stone Lake in the record is as of December 31, 2015, approximately seven months ago. Docket 171, Ex. D. During this time, Stone Lake's asset to liability ratio may have changed entirely from what it was during 2015.

More, Stone Lake's intention to plant "more acreage" of organic corn this year is not credible as it is too late for such a planting. The planting of corn is done during the spring. See Docket 96.

The court is unpersuaded by Stone Lake's financial ability to contribute to the plan.

(7) The **projected $535 a ton price for organic corn is inflated given the testimony of Mr. Squires of $420 to $440 a ton. Docket 96**, Squire Decl. The $535 a ton price appears to be based on transactions that took place during 2014, whereas Mr. Squires' testimony is based on more recent data. This is another reason the court is not convinced of the plan's feasibility.

(8) The court cannot determine feasibility even if it were to agree with the debtor's projected income over the next five years (Docket 171, Ex. F), including contributions from Stone Lake. The plan does not identify all payments required by the plan. Although the debtor's financial projections state $180,000 a year for payments under the plan, the court cannot tell from the record how the debtor arrived at this figure. Docket 171, Ex. F.

(9) The court cannot determine feasibility because the **debtor has not elaborated on the over $110,000 in other farming expenses identified in its future financial** projections. For instance, the record says nothing about what those expenses involve, why they are reasonable and how they compare with the debtor's or its principal's past payment of such expenses. Such expenses include, without limitation, seed, irrigation, labor, equipment repairs and maintenance. Docket 171, Ex. F.

(10) The record on feasibility is inadequate because it does not address the current drought issues being experienced throughout California.

(11) The **arrangement with creditor Michael Thiel to pay $30 a month for the rental of a residence on the estate's real property prejudices other creditors, including the three mortgage creditors senior to the Thiel Trust**, because the debtor is not receiving fair market rental value for that residence, while the plan is paying only interest to the senior mortgage creditors.

(12) There is no evidence in the record about the present condition of its real property, including the status of crops.

1　　　　The court finds it unnecessary to address any other basis for plan confirmation denial.

2

3 Civil Minutes, Dckt. 223. In the above, Judge Michael McManus (the judge to whom this case was then assigned) concluded that the Debtor was attempting to favor "insider-like" creditors, not disclosing information, and purporting to having funding from related entities without any evidentiary support.

In denying confirmation of the proposed First Amended Plan, Judge McManus had similar concerns with the Debtor, including:

| | | |
|---|---|---|
| | A. | The First Amended Plan failed to provide for payment of unsecured claims in full, when in light of the Chapter 7 liquidation analysis they would be paid in full and the requirements of 11 U.S.C. § 1225(a)(4). |
| | B. | The Debtor failed to show the First Amended Plan to be feasible, the court concluding that "The record on this motion is plagued with inadmissible or insufficient evidence, inconsistencies, vague assertions, and ambiguities." |
| | C. | These feasibility shortcomings include Debtor not providing financial background information of its operations or the basis for financial projections. |
| | D. | No evidence was presented how the affiliated Stone Lake entity would contribute $60,000 a year to the Plan. |
| | E. | Debtor's principal, Mr. Samra, demonstrated limited knowledge of the Debtor's operations, not even knowing what equipment was owned by the Debtor. |

Civil Minutes, Dckt. 126. As discussed above, the Debtor continued to try and maintain the case without fixing these evidentiary and informational shortcomings.

Judge McManus, in connection with a Motion by Ag-Seeds Unlimited to enforce a 2004 Examination Order, concluded that Debtor and Debtor's counsel knowingly failed to comply with the court's prior order for the examination and:

> From the foregoing **actions by the debtor and its counsel**, the **court infers bad faith** on the part of the **debtor and its counsel**, Noel Knight, involving **ill will** or, at the least, an **affirmative attempt to violate** the law violation of **the court's March 23 order**.
>
> Accordingly, the court will **impose** the following **sanctions against the debtor and its counsel**. The shall appear for an examination on June 20, 2016 at 10:00 a.m. in this court's public conference room just outside the courtroom. The court will order the debtor to comply with the document production request as originally propounded on the debtor. The documents sought by Ag shall be produced to Ag no later than noon on June 17, 2016, at the law offices of Ag's counsel.

9

> The court will also **award the requested $875 to Ag's counsel** to compensate Ag for having to file and prosecute this motion. The filing and prosecution of the motion was necessary, given the debtor's refusal of the exam and document production.

Civil Minutes, Dckt. 152 (emphasis added).

When the above order was not complied with by Debtor, another Motion to Compel was filed and further sanctions ordered by Judge McManus. Civil Minutes, Dckt. 246. Those Civil Minutes include:

> The **debtor and his counsel, Noel Knight, have once again violated an order of this court** pertaining to Ag's March 22 request for Rule 2004 examination and document production. The debtor and its counsel did the same with the court's June 13 order as they had done with the court's March 23 order. See Docket 152 (making findings relating to the debtor's violations of the March 23 order). The debtor promised compliance with the June 13 order but then failed to actually comply.
>
> . . .
>
> **Noel Knight and his client have once again blatantly disobeyed a clear and unambiguous order of the court** by failing to satisfy the June 17 and June 20 requirements. The debtor did not produce the documents by the June 17 deadline, did not pay the sanctions based on Ag's prior motion to compel by the June 17 deadline, and did not appear on June 20 for the examination. The debtor did not comply with the court's June 13 order even after Ag gave it another opportunity to appear for a Rule 2004 examination and produce documents.
>
> . . .
>
> Both the **debtor and its counsel were aware of the court's June 13 order**. The debtor's failure to:
>
> - produce documents on June 17;
> - pay the sanctions by June 17—which were assessed jointly and severally against both the debtor and its counsel;
> - appear at the June 20 examination;
> - produce the requested bank statements, cancelled checks, check registers, balance sheets, Quicken/Quickbook records, documents relating to all its four loans secured by the real property; and
> - provide the basic information asked for by Ag at the July 15 examination of Paul Samra,
>
> amounts to **bad faith and willful violation of the court's June 13 order by both the debtor and its counsel**, Noel Knight.
>
> . . .
>
> Accordingly, the **debtor and its counsel are both in contempt of court**. The court will award the requested $1,985 in sanctions to Ag jointly and severally against both the debtor and its counsel, Noel Knight.

Civil Minutes, Dckt. 246 (emphasis added).

The court issued an Order to Show Cause concerning the above failure to comply with the court's orders. In determining that Debtor and Debtor's counsel merited further sanctions, Judge McManus determined:

10

> Nevertheless, after five months of litigation, multiple motions to compel and multiple orders for sanctions against Noel Knight and the debtor, over a relatively simple motion for a 2004examination and document production, Mr. Knight and the debtor now claim that the person they have been tendering for the 2004exam, Paul Samra, knows little or nothing of the debtor's financial affairs. No wonder Paul Samra was not answering the questions of Ag's counsel at his July 15 2004 examination.
>
> **Noel Knight and the debtor then have not been tendering the person "most knowledgeable"** about the debtor's financial affairs. In other words, by tendering Paul Samra for the 2004 examination, when they did, **Noel Knight and the debtor have been further violating the court's March 23, 2016 2004 exam order and the subsequent orders on Ag's motions to compel.**
>
> This further confirms that **Mr. Knight and the debtor will stop at nothing to disobey a court order**, even multiple times, **when it will serve their interests**. When confronted with one deception, **Noel Knight and the debtor change their story to satisfy their purposes**. Their **egregiousness of conduct is quite troubling**. The court is not convinced that the sanctions it assessed against them pursuant to Ag's motion to compel, heard on August 15, is sufficient to deter them from engaging in further violations and disregard of court orders.
>
> Accordingly, the court will assess **additional joint and several sanctions against Noel Knight and the debtor in the amount of $2,000.** Such sanctions are designed to coerce future compliance by Noel Knight and the debtor with orders of this court. The sanctions shall be paid into the United States Treasury no later than sixteen days after entry of the order on this order to show cause. The payment shall be tendered to this court's clerk's office.

Civil Minutes, Dckt. 318 (emphasis added).

The above decisions of Judge McManus are consistent with those made by the judge at the January 30, 2019 hearing (which was made before reading these prior decisions).

In reviewing the above, one might question whether the Debtor was just represented by a newer attorney, well over his or her head, and stumbling through the case getting sanctioned. As reported by the State Bar, Mr. Knight has been licensed as an attorney in California for sixteen years.[2] It is also reported that he graduated from Rutgers University School of Law.[3]

A review of the court's files indicates that Mr. Knight has a long history of representing clients in bankruptcy cases in this District - Chapter 7, 11, 12, and 13 cases. A search of the files discloses forty-eight (48) bankruptcy cases in which Mr. Knight was an attorney. Thirteen were

---

[2] http://members.calbar.ca.gov/fal/Licensee/Detail/223821

[3] The U.S. News & World Report Rankings of Law Schools lists Rutgers School of Law at #74 in the country.
https://www.usnews.com/best-graduate-schools/top-law-schools/rutgers-university-newark-03209.

11

Chapter 11 cases, in which he represented the debtor in possession. The court's file also show Mr. Knight representing the debtor in possession in two Chapter 12 cases (including the current case). The balance of the cases are Chapter 7 cases and one Chapter 13 case. Thus, the representation is not by an attorney inexperienced in federal court and bankruptcy law.

While the prior decisions of Judge McManus were not used by (or even reviewed by) the court in coming to its decision that cause existed for the dismissal of this case, they demonstrate the decision to dismiss is not unreasonable and that this court's conclusions about the lack of credibility in the arguments advanced by counsel for Debtor are not only well founded upon the evidence and arguments considered at the January 30, 2019 hearing, but well founded based on the documented (mis)conduct of Debtor and Debtor's counsel.

This Supplemental Memorandum Opinion and Decision is made a part of the court's findings and conclusions stated on the record, and they are made a part hereof.

## Instructions to Clerk of Court
**Service List - Not Part of Order/Judgment**

**The Clerk of Court is instructed to** send the Order/Judgment or other court generated document transmitted herewith *to the parties below*. The Clerk of Court will send the document via the BNC or, if checked ____, via the U.S. mail.

| **Debtor**(s) | **Attorney for the Debtor**(s) (if any) |
|---|---|
| **Bankruptcy Trustee** (if appointed in the case) | Office of the U.S. Trustee<br>Robert T. Matsui United States Courthouse<br>501 I Street, Room 7-500<br>Sacramento, CA 95814 |